IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. |
| | ) | 14-00017-01-CR-W-HFS |
| GREGORY A. FIELDS, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION TO DENY
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

Before the court is Defendant's motion to suppress evidence. Defendant moves the Court to suppress all evidence obtained from the December 28, 2013 Terry stop, on grounds of a Fourth Amendment violation. For the following reasons, Defendant's motion should be denied.

*I. BACKGROUND*

An indictment was returned on January 28, 2014, charging Defendant with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

On April 14, 2014, Defendant filed a motion to suppress evidence (Doc. No. 21). The Government responded on April 28, 2014 (Doc. No. 24). An evidentiary hearing was held on August 7, 2014. The government appeared by Assistant United States Attorney Christina Tabor. Defendant was present, represented by appointed counsel Bob Kuchar. The government called Kansas City, Missouri Police Detective James Manley and Kansas City, Missouri Police Officer Michael Sartain to testify. Antwane Williams testified on behalf of Defendant. The following exhibits were admitted into evidence:

Government's Exhibit 1:  Dash Cam Video (4878@20131228161737)

1

## II. EVIDENCE

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact.

1. Detective James Manley has been employed by the Kansas City, Missouri Police Department since February of 2002 (Tr. at 4). He was a patrol officer until September of 2003, a member of the Street Narcotics Unit until approximately 2009 and is now assigned to the Illegal Firearms Squad (Tr. at 4). As part of the Illegal Firearms Squad, Detective Manley assists the Violent Crimes Division and deals with gun violence and individuals with firearms (Tr. at 5).

2. On December 28, 2013, Detective Manley was conducting surveillance at a funeral for a homicide victim (Tr. at 5). The purpose of conducting surveillance was two-fold: to gather any intelligence that may assist in solving the unsolved homicide; and for protection of the community and family members (Tr. at 5-6, 7-8).

3. Detective Manley testified it was not uncommon for disturbances or violence to break out at funerals (Tr. at 9-10). The persons involved in the disturbance could be strangers to the family or someone with whom the family is familiar (Tr. at 9-10). He further testified it was not uncommon for the perpetrator of a crime to attend the victim's funeral (Tr. at 38).

4. The homicide victim for whom the funeral was being conducted was shot in front of his residence on December 19, 2013; his family members were present at the time of the shooting (Tr. at 6). Because the homicide remained unsolved, the intended target(s) were unknown (Tr. at 7). The family was concerned that they could have been the intended targets and requested a police presence at the funeral (Tr. at 7-8).

5. Two marked police cars were parked directly across the street from the funeral home (Tr. at 8, 11). There were also multiple surveillance detectives, including Detective Manley, in unmarked cars and plain clothes (Tr.at 8-9, 12). Detective Manley was parked in a parking lot across the street from the funeral home (Tr. at 12).

6. The funeral was held from 2:00 p.m. through 4:00 p.m. (Tr. at 8). Detective Manley testified that there was parking available for those in attendance in a parking lot adjacent to the funeral home, along the curb in front of the funeral home, as well as across the street (Tr. at 10-11). He estimated up to 100 people attended the funeral (Tr. at 23).

7. Shortly after 4:00 p.m., Detective Manley observed a green Chevy Tahoe park approximately 150 feet north of the funeral home (Tr. at 13, 25). The Tahoe was parked legally and appeared to be registered legally (Tr. at 25-26, 28). He initially believed the Tahoe was associated with the townhomes in front of which it parked rather than with the funeral home because it parked so far down the block (Tr. at 13). Detective Manley testified that parking was available in front of and near the funeral home at this point (Tr. at 12-13, 14).

8. Four males exited the Tahoe and walked toward the funeral home; they did not appear to be in a hurry and did not walk in a clandestine fashion (Tr. at 14, 27-28). Their dress was consistent with that of other attendees (Tr. at 38-39). The men entered the funeral home without any resistance (Tr. at 28-29).

9. Because the homicide remained unsolved, Detective Manley did not know if these individuals were associated with the shooting (Tr. at 15). The four individuals stayed inside the funeral home for a couple of minutes and then returned to stand outside

of the Tahoe (Tr. at 15-16). Two of the men then returned to the funeral home (Tr. at 16). They were inside for a couple of minutes and then exited (Tr. at 16). Upon exiting, the men flanked the door to the funeral home for approximately fifteen minutes during which time they did not speak to each other (Tr. at 16-17, 18, 40). Detective Manley testified they appeared to be waiting for something (Tr. at 18).

10. While observing these two men outside the door, Detective Manley received a telephone call from a funeral home employee stating the family did not know the men standing outside and were concerned for their safety (Tr. at 19, 30, 37). The employee did not indicate that the men were being aggressive, hostile or threatening (Tr. at 30-31).

11. The individuals' arrival after the funeral had concluded, the location where they parked despite ample parking in front of the funeral home, the fashion in which the men stood outside the door and the period of time for which they stood there, and the call from the funeral home employee caused Detective Manley security concerns (Tr. at 17, 34-35). Detective Manley, therefore, requested that the officers in the marked patrol cars conduct a pedestrian check of the four individuals associated with the Tahoe (Tr. at 20).

12. The two men who were standing outside the funeral home door returned to the Tahoe (Tr. at 21; Gvt. Exh. 1 at 4:18:47). Their mannerisms did not indicate they were trying to be secretive or hiding anything (Tr. at 29). As police approached, one of the individuals -- later identified as Defendant -- walked away from the group and back toward the funeral home and was intercepted by a marked patrol vehicle (Tr. at 31-33; Gvt. Exh. 1). At this point, Detective Manley did not believe Defendant to be

4

committing a crime (Tr. at 36).

13. Police Officer Michael Sartain testified he was assigned to the funeral home at approximately 3:27 p.m. (Tr. at 42, 43, 62). He was located across the street from the funeral home, approximately eight feet away (Tr. at 63). Shortly after 4:00, Officer Sartain also observed the two men standing on each side of the funeral home door as if they were guards protecting the door (Tr. at 47, 48, 49, 63). They stood approximately six feet apart and did not appear to be speaking to each other (Tr. at 49, 63). The men's demeanor caught Officer Sartain's attention and caused him to wonder if they were armed (Tr. at 49, 79). He was not aware that they were aggressive, hostile or violent (Tr. at 64).

14. Defendant did not do anything specific while walking from the funeral home back to the Tahoe that caused Officer Sartain to believe he was committing a crime (Tr. at 67). Defendant did not make any gestures that would suggest he had a handgun on his person (Tr. at 66). Defendant walked at a regular pace; he was not dressed in a suspicious manner (Tr. at 66). Rather, Officer Sartain found Defendant's behavior suspicious due to concern that violence may erupt at the funeral, the fact that Defendant stood outside the funeral home door for fifteen to twenty minutes, was approximately five to six feet from another individual standing at the other side of the door and was not talking, as if he were doing a job (Tr. at 77-78).

15. At approximately 4:20 p.m., Officer Sartain received a radio call to stop and identify the four individuals associated with the Tahoe (Tr. at 50). As he approached, Defendant walked away from the group and toward Officer Sartain's patrol car (Tr. at 50; Gvt. Exh. 1). Officer Sartain noticed a bulge on Defendant's right hip

that was consistent with a weapon (Tr. at 50-51, 62, 79). Defendant did not reach for the bulge, tell anyone that he had a gun or make any physical gestures to indicate that the bulge was a gun (Tr. at 68).

16. The bulge's consistency with a weapon, the fact that the funeral was for a homicide victim, the behavior of Defendant and the other individual standing outside the funeral home door, and the gun squad asking him to identify these individuals caused Officer Sartain a heightened sense of awareness for safety reasons (Tr. at 62).

17. Officer Sartain pulled his vehicle into the driveway of the funeral home and stopped Defendant (Tr. at 50; Gvt. Exh. 1). At this point, Defendant was not free to leave (Tr. at 69-70).

18. Officer Sartain immediately asked Defendant if he was armed (Tr. at 51, 71). Defendant replied "yes" and nodded toward his hip (Tr. at 51, 80). Officer Sartain then handcuffed Defendant and retrieved a concealed handgun from his waistband (Tr. at 51, 56, 74-76). The handgun was loaded with one live round in the chamber and ten rounds in the magazine (Tr. at 51-52).

19. Officer Sartain learned Defendant had felony convictions and placed him under arrest for being a felon in possession of a firearm (Tr. at 55). Officer Sartain also learned that Defendant did not have a permit for carrying a concealed weapon (Tr. at 56).

20. Officer Sartain testified that neither he nor his partner, Officer Secaida, drew and/or pointed their guns at Defendant (Tr. at 52). They, likewise, did not physically abuse Defendant or verbally shout at him (Tr. at 52).

21. Officer Sartain testified he had previous experience with violent

confrontations at funerals, including drive-by shootings and fights (Tr. at 45).

22. Antwane Williams has known Defendant for approximately twenty years; they grew up in the same neighborhood and went to elementary and middle school together (Tr. at 82, 89). Mr. Williams loves Defendant like a brother (Tr. at 89).

23. On December 28, 2013, Mr. Williams went to the funeral with Defendant, Leland Foster and Anthony Spriggs (Tr. at 82). He was not certain what time they arrived, but thought it was around two or three o'clock (Tr. at 91, 93). Mr. Williams testified the funeral home's parking lot and the street in front of the funeral home were full so they parked in front of some nearby apartments (Tr. at 84, 93). He further testified the four men went inside the funeral home, viewed the body, spoke with the family, got obituaries and then left (Tr. at 85). Upon returning to the Tahoe, they thought they had lost the keys (Tr. at 85). All four men went back to the funeral home and inquired about the keys (Tr. at 85-86). They returned to the Tahoe again, at which time Defendant went back to the funeral home to check one last time (Tr. at 86-87). On the way there, Defendant was stopped by police (Tr. at 87).

24. Mr. Williams was not aware that Defendant had a prior felony conviction or that he was armed on December 28, 2013 (Tr. at 96-97).

### III. LEGAL ANALYSIS

Defendant maintains law enforcement lacked the reasonable suspicion necessary to conduct an investigatory stop. Based on this alleged illegality, Defendant argues that all evidence obtained as a result of the resulting search should be suppressed. I disagree.

To make an investigative stop, officers must have reasonable suspicion that criminal activity is afoot; the reasonable suspicion must be based upon specific and articulable facts

which, taken together with rational inferences from those facts, reasonably warrant the intrusion. Terry v. Ohio, 392 U.S. 1, 25-30 (1968). The existence of reasonable suspicion is determined from the totality of the circumstances in light of the officers' experience. United States v. Sokolow, 490 U.S. 1, 7-10 (1989); United States v. Cortez, 449 U.S. 411, 418 (1981).

The principal components of a determination of reasonable suspicion will be the events which occurred leading up to the stop, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion. Ornelas v. United States, 517 U.S. 690, 696 (1996). "A police officer views the facts through the lens of his police experience and expertise. The background facts provide a context for the historical facts, and when seen together yield inferences that deserve deference." Id. at 699. Therefore, the facts must be viewed in light of the officer's experience and familiarity with criminal activity. United States v. Johnson, 64 F.3d 1120, 1124 (8th Cir. 1995). "Even innocent actions may give rise to reasonable suspicion if they warrant consideration under the totality of the circumstances." Id. See also United States v. Arvizu, 534 U.S. 266, 277 (2002)("A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct."). Officers "need not be able to identify the specific crime the officer is investigating; rather the officer need only reasonably suspect that the individual is engaged in some kind of criminal activity." United States v. Noonan, No. 12-CR-1016-LRR, 2013 WL 500828 at *4 (N.D. Iowa Feb. 11, 2013)(citing United States v. Guardado, 699 F.3d 1220, 1225 (10th Cir. 2012)("Direct evidence of a specific, particular crime is unnecessary [for an investigative stop].")); United States v. Pack, 612 F.3d 341, 357 (5th Cir. 2010)("[T]he police do not have to observe the equivalent of direct evidence of a particular specific crime in order to detain a lawfully stopped individual to investigate where there is reasonable suspicion of

criminal activity on his part.")

In this case, officers had reasonable suspicion to stop Defendant. Detective Manley and Officer Sartain both testified that it was not uncommon for disturbances or violence to break out at funerals. Detective Manley further testified it was not uncommon for the perpetrator of a crime to attend the victim's funeral. The homicide of the victim for whom the funeral was being held remained unsolved and it was unknown whether the victim or members of his family were the intended targets.

Against this backdrop, Defendant's actions warranted the intrusion. Specifically, the group of individuals with whom Defendant attended the funeral arrived after the service was over. They parked approximately 150 feet away from the funeral home despite there being ample parking closer.[1] After exiting the funeral home, Defendant and one of the other men stood five to six feet apart on either side of the funeral home's exit for fifteen to twenty minutes without speaking to each other. A funeral home employee called Detective Manley to convey that the family did not know the men and were concerned for their safety. Furthermore, as Officer Sartain was approaching Defendant he noticed a bulge on Defendant's right hip consistent with a weapon; the bugle was inside Defendant's waistband, covered by his shirt. "Under Missouri law, it is unlawful to knowingly carry a concealed weapon." United States v. Woods, 747 F.3d 552, 556 (8th Cir. 2014)(citing Mo. Rev. Stat. § 571.030.1(1)). Defendant's motion to suppress should, therefore, be denied.

---

[1]Although Mr. Williams testified there were not spots available in the parking lot or on the street in front of the funeral home, I find he did not remember the details about that afternoon clearly. This misrecollection is further illustrated by his testimony that they attended the funeral around two or three o'clock, when the dash cam video shows police encountering Defendant and the individuals he was with at approximately 4:19 p.m. Additionally, Mr. Williams' testimony that all four men returned back to the funeral home is inconsistent with Detective Manley and Officer Sartain's testimony, as well as with the details of the funeral home employee's phone call to Detective Manley.

## IV. CONCLUSION

For the above-stated reasons, it is

RECOMMENDED that the Court, after making an independent review of the record and the applicable law, enter an order denying Defendant's motion to suppress.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has fourteen days from the date of this report and recommendation to file and serve specific objections to the same, unless an extension of time for good cause is obtained. Failure to file and serve timely specific objections may result in waiver of the right to appeal factual findings made in the report and recommendation which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 10, 2014